820 July 29, 2026 No. 715

IN THE COURT OF APPEALS OF THE
STATE OF OREGON

In the Matter of C. D. S.,
a Child.

DEPARTMENT OF HUMAN SERVICES,
*Petitioner-Respondent,*

*v.*

T. R. S.,
*Appellant.*

Jackson County Circuit Court
24JU01824; A188530 (Control)

In the Matter of C. R. R. S.,
a Child.

DEPARTMENT OF HUMAN SERVICES,
*Petitioner-Respondent,*

*v.*

T. R. S.,
*Appellant.*

Jackson County Circuit Court
24JU01823; A188529

David J. Orr, Judge.

Argued and submitted April 22, 2026.

George W. Kelly argued the cause and filed the brief for appellant.

Kyleigh Gray, Assistant Attorney General, argued the cause for respondent. Also on the brief were Dan Rayfield, Attorney General, and Paul L. Smith, Solicitor General.

Before Ortega, Presiding Judge, Joyce, Judge, and Hellman, Judge.

HELLMAN, J.

Reversed.

**HELLMAN, J.**

Father appeals from judgments terminating his parental rights to his children, R and C, who were five- and four-years-old, respectively, at the time of trial.[1] On appeal, father raises three assignments of error. In his first and second assignments, he challenges the juvenile court's decision to terminate his parental rights on the basis that he is unfit under ORS 419B.504, and on the basis of neglect under ORS 419B.506. In his third assignment, he argues that the court erred by ruling that termination of his parental rights is in the children's best interests under ORS 419B.500.

On *de novo* review, we conclude that clear and convincing evidence establishes that father's conduct, including his substance abuse, which he has struggled to manage, poses a serious detriment to the children and that his limited progress in ameliorating the conditions leading to Oregon Department of Human Services' (ODHS) intervention makes the children's integration into his home within a reasonable period of time highly improbable. Because we conclude that father is unfit, we do not reach father's second assignment of error regarding the court's determinations of neglect. However, we also conclude that ODHS did not carry its burden to prove that terminating father's parental rights was in R's and C's best interests. Specifically, we conclude that severing the significant bond between father and the children risked harm to R and C, and that ODHS did not present sufficient evidence to establish that termination, as opposed to a permanent guardianship, was in the children's best interests. We therefore reverse.

We review proceedings for termination of parental rights *de novo*. ORS 19.415(3)(a) ("Upon an appeal from a judgment in a proceeding for the termination of parental rights, the Court of Appeals shall try the cause anew upon the record[.]"). That standard requires us to examine the record with "fresh eyes" to determine whether the evidence below persuades us that it is "highly probable" that father is unfit, that integration is improbable within a reasonable time, and that termination is in the children's best

---

[1] The appeals in Case Nos. A188529 and A188530 have been consolidated for purposes of opinion and otherwise remain separate cases.

interests. *Dept. of Human Services v. T. L. M. H.*, 294 Or App 749, 750, 432 P3d 1186 (2018), *rev den*, 365 Or 556 (2019). Although our review is *de novo*, we give "considerable weight to the findings of the trial judge who had the opportunity to observe the witnesses and their demeanor in evaluating the credibility of their testimony." *Dept. of Human Services v. T. L. B.*, 294 Or App 514, 516, 432 P3d 343 (2018), *rev den*, 365 Or 556 (2019) (internal quotation marks omitted).

We briefly recount those facts necessary to provide context for our ruling and supplement those facts in the discussion of father's assignments of error. R was born in April 2019, and C was born in June 2020. In March 2022, ODHS became involved with the family after an incident in which father left the children unaccompanied in the car for approximately 15 minutes while he ran an errand, for which he was charged with second-degree child neglect. Later that same month, ODHS filed petitions asking the juvenile court to assert jurisdiction over the children on the basis that father's and mother's substance abuse, as well as father's mental health issues, interfered with their ability to safely parent, and that mother had exposed the children to a chaotic and volatile home environment in which she was verbally abusive to father and the children. Father and mother admitted those allegations, and the juvenile court asserted jurisdiction in June 2022. At the time the children were removed from their parents' care, father and the children had been living with father's friend of 30 years, J, and his wife. J asked father to leave the home, and the couple became the resource parents to the children.

Father's and mother's relationship has been, at times, volatile and marked by domestic violence. In June 2022, law enforcement responded to a domestic disturbance in which mother attempted to hit father with her car. Father reported to the responding officers that mother had "sped towards him" in her car, that "the vehicle contacted him and forced him onto the hood," and that he had been "in fear that [mother] was trying to run him over with her vehicle." Multiple neighbors witnessed the incident and corroborated father's account. Mother was arrested and later convicted of menacing constituting domestic violence, reckless driving,

and recklessly endangering another person. Mother was sentenced to two years of probation and, as a condition of her probation, was ordered to have no contact with father.

For at least a few months following the June 2022 incident, mother and father continued to live together, and even after the no-contact order went into effect in August 2022, mother and father continued to see each other "periodically." Specifically, an ODHS caseworker, Mayfield, made unannounced visits to father's and mother's homes in both July and August of 2022 and found mother and father together. In September 2022, father admitted to Mayfield that he and mother were "living together" at his mother's home but asserted that "they had separate rooms and that they stayed in different parts of the house." In June 2023, the children were returned to mother for a trial reunification, during which time Mayfield was aware that mother and father were "consistently" violating the no-contact order. Mayfield "tried to work with the parents and have them completely understand about the no-contact order" but did not remove the children based on that violation. The trial reunification was ultimately unsuccessful, lasting approximately two months, and the children were returned to substitute care with J and his wife.

At the termination trial, when questioned about the June 2022 incident, father offered a different account of the incident. He denied that mother had hit him with her car, testifying that "she came up close to me at a crawling speed" and that "I had no fear of her actually hitting me at all." By the time of trial, the no-contact order had expired, and mother and father were living together again. Since June 2022, no other incidents between father and mother had involved law enforcement. However, ODHS continued to have "concerns" about their living arrangement and relationship because, as a caseworker testified, "the domestic violence portion is still something that has not been addressed and there's no accountability there." Father testified that he had "a hope" that mother would help him parent because "that would make things a lot easier" but affirmed that if mother was "not clean and sober" or "wasn't doing what she needed to be doing" he would be willing and able to act protectively toward the children.

Father also has a history of methamphetamine use. Throughout the life of the dependency case, father has started substance abuse treatment multiple times, but his participation in those programs has been inconsistent. After initially seeking treatment in March 2022, he stopped attending services, and five months later, "self separated from recommended services against professional advice." Father enrolled in a different program in October 2022 and was diagnosed with stimulant use disorder and other stimulant dependence. He consistently engaged with the program for several months, but by January 2023, his attendance had dropped off. In May 2023, he had a positive urinalysis (UA) for methamphetamine, and his counselor testified that father had failed to "ma[k]e sustained meaningful progress in treatment." He was later discharged from that program. In January 2024, father again began substance abuse treatment and graduated from inpatient treatment in May 2024. However, his participation in outpatient treatment was "sporadic," and in September 2024, he again had a positive UA for methamphetamine. At the time of trial, father had recently reengaged with a treatment program after receiving a DUII, but he had thus far failed to comply with the UA schedule as required by the terms of his diversion program, and he had yet to complete the required coursework.

Since removal from their parents' care in March 2022, and apart from a two-month trial reunification in the summer of 2023, the children have lived with J and his wife, who are also the children's designated adoptive placement. The children have spent the majority of their life in substitute care and "see [J and his wife] as their parents[,]" although they also call father "Daddy." Dr. Coghlan, a child psychologist, evaluated both children in 2024. She diagnosed R with attention-deficit/hyperactivity disorder and "other specified trauma- and stressor-related disorder, developmental trauma disorder." She diagnosed C with global developmental delay as well as attention-deficit/hyperactivity disorder and recommended that ODHS and his caregivers pursue early childhood and special education services for him. At the termination trial, Coghlan opined that the children needed permanency as soon as possible but that they were also attached to their biological parents:

"So in my report I talked about just the need for permanency as quickly as possible because of how long they've been in care and that they've had unsuccessful reunification. In my report, I do talk about kind of competing needs in terms of permanency. So there's a lot of things that are in these [children's] best interest. I think from an attachment perspective, it's definitely in [the children's] best interest to maintain as many safe and appropriate relationships with caregivers and family members as possible. It's also in their best interest to have a permanent placement that's not at risk for future disruption. So kind of balancing those needs is what decision-makers need to do in figuring that stuff out."

As to maintaining relationships with family members, she explained that, "I think [the children have] had consistent contact with their biological parents this whole time, so severing that relationship would be stressful for [them] and could result in emotional distress, behavioral dysregulation, all those kinds of things."

J testified that he and his wife wanted to adopt the children because they "were very much part of our family and * * * we wanted to make that official[.]" A caseworker, Rouhier, testified that adoption was in the children's best interests because of "concerns about the issues with boundaries" and "parents adhering to those boundaries." She explained that mother and father did not understand "the full scope of * * * what's happening here and that when parental rights are terminated they will not have the decision-making power that they have today." Father specifically had shown up at J's home "unannounced a few times, not recently." Rouhier explained that "[t]his is a historical behavior on the case, but they're having instances where he showed up asking to take the [children], saying 'I wanted to take them to the park,' and didn't seem to understand that you can't just take them." She therefore opined that J and his wife need "full legal authority to exercise and set" boundaries.

Following the trial, the juvenile court concluded that father was unfit, that he had neglected the children, and that termination of father's parental rights was in the children's best interests. In concluding that father was unfit, the court ruled that ODHS had proved, by clear and

convincing evidence that father's substance abuse, physical and emotional neglect of the children, lack of effort to adjust his circumstances, exposure of the children to domestic violence, failure to present a viable plan for return of the children to his care and custody, and failure to learn or assume parenting skills rendered him unfit and made integration of the children into his home improbable within a reasonable time. In reaching the conclusion that termination was in the children's best interests, the court found that "there was a very serious problem with Father's credibility" because "[h]is testimony regarding the automobile incident, and it's maybe somewhat unpleasant to say, but it's clear to me that *** [father] sat there and [father] committed perjury[.]" Because of the "honesty problems" on the parents' part, the court concluded that it was not "farfetched *** to imagine, once the kids are a little bit older, the parents influencing the children to bring forward some kind of action to terminate the guardianship." The court also found that "a significant bond between father and [the children]" exists but that the risk in severing the legal relationship was "almost non-existent" because the court credited J's testimony that he would foster a relationship between father and the children when it was safe and appropriate to do so. Father appealed the judgments as to both C and R.[2]

Father first argues that the juvenile court erred in terminating his parental rights on the basis of unfitness under ORS 419B.504. A juvenile court may terminate a parent's rights based on unfitness if it determines by clear and convincing evidence that the parent is "unfit by reason of conduct or condition seriously detrimental to the child or ward and integration of the child or ward into the home

_____

[2] The juvenile court also terminated mother's parental rights to both children, and she separately appealed those judgments. We affirmed the juvenile court's termination of her rights in *Dept. of Human Services v. J. E.*, 349 Or App 587 (2026) (nonprecedential memorandum opinion). However, "[t]he rights of one parent may be terminated without affecting the rights of the other parent[,]" ORS 419B.500, and we thus review father's challenge to the termination of his rights independent of our review in mother's case. *See, e.g.*, *State ex rel Juv. Dept. v. Proctor*, 167 Or App 18, 29-30, 34, 2 P3d 405, *adh'd to on recons*, 169 Or App 606, 10 P3d 332 (2000) (terminating the father's parental rights but concluding that the mother's parental rights should not be terminated because "[o]ur obligation in reviewing this matter is to apply the legal standards for termination articulated in the statutes" to each parent).

of the parent or parents is improbable within a reasonable time due to conduct or conditions not likely to change." ORS 419B.504; ORS 419B.521(1) ("The facts on the basis of which the rights of the parents are terminated, unless admitted, must be established by clear and convincing evidence * * *."). "Both the 'serious detriment' and 'reasonable time' inquiries are child-specific and require evidence in psychological and developmental terms regarding the particular child's needs." *Dept. of Human Services v. C. F. S.*, 345 Or App 71, 72-73, 581 P3d 1006 (2025), *rev den*, 375 Or 67 (2026) (internal quotation marks omitted). ODHS has the burden to prove that a parent is presently unfit at the time of the termination trial—"past unfitness is insufficient." *Dept. of Human Services v. B. J. J.*, 282 Or App 488, 503, 387 P3d 450 (2016) (internal quotation marks omitted).

Having reviewed the record *de novo*, we conclude that father was unfit at the time of the termination trial. Clear and convincing evidence demonstrates that father has failed to consistently participate in or successfully complete treatment to address his substance abuse and that he denies or otherwise minimizes ODHS's concerns about domestic violence in his relationship with mother. Although he testified that he would parent without mother if needed, father's lack of parenting skills presented an ongoing risk of harm to the children. Father had a history of physically neglecting the children while they were in his care, and throughout the life of this case, he has failed to consistently engage in case planning and has only minimally engaged with the services offered to him to improve his parenting skills.

Those conditions and conduct would be seriously detrimental to C and R, especially considering their need for a "permanent placement that's not at risk for future disruption." Dr. Coghlan, a child psychologist who evaluated the children, testified that if the children were placed in an environment where their "needs aren't met consistently," whether because of substance abuse or domestic violence in the home, it could result in dysregulation and may hinder "therapeutic progress." Thus, given the length of time the children have been in care, the services provided to father, and father's minimal level of engagement with and progress

in those services, we conclude that the issues which led to the juvenile court's jurisdiction over the children cannot be resolved within a reasonable amount of time for the children to return to his care. Accordingly, the juvenile court did not err in ruling that father was unfit under ORS 419B.504, and we therefore do not reach father's second assignment that the juvenile court erred in terminating his parental rights on the basis of neglect pursuant to ORS 419B.506. *See State ex rel Dept. of Human Services v. Radiske*, 208 Or App 25, 59, 144 P3d 943 (2006) ("[T]he trial court terminated [the] father's parental rights based on unfitness, ORS 419B.504, *and* neglect, ORS 419B.506, both of which, if proven, are independently sufficient statutory grounds for termination." (Emphasis in original.)).

We turn then to father's third assignment of error, in which he argues that ODHS failed to carry its burden to show that terminating his parental rights is in C's and R's best interests under ORS 419B.500. "Whether terminating the legal relationship between a parent and a child is in the child's best interest requires a fact-specific, child-centered inquiry into how termination likely will affect the particular child." *Dept. of Human Services v. L. M. B.*, 321 Or App 50, 52, 515 P3d 927 (2022). In considering whether termination of the legal relationship is in the child's best interest, we consider "(1) the strength of the bond between the parent and child; (2) whether severing that bond will help or harm the child; (3) the benefits to the child of terminating parental rights; and (4) the risk of harm to the child posed by termination." *Id.* at 53. Importantly, the juvenile court's determination that a parent is unfit does not give rise to a presumption that termination is in the child's best interest. *Dept. of Human Services v. T. M. D.*, 365 Or 143, 161, 442 P3d 1100 (2019).

Here, as the juvenile court found, there is a "significant bond" between father and the children. Even though the children have been in substitute care for the majority of their lives, they understand that father is their biological parent, and they call him "daddy." Father attends supervised visits with the children, during which father is "consistent[ly]" "loving, and affectionate, and engaged," although

both C and R sometimes revert to "old behaviors" after visits with father. The record also contains evidence that severing the bond with their father could harm the children and potentially result in "emotional distress and behavioral dysregulation." Dr. Coghlan further opined that the children should be able to maintain relationships with their biological family members when doing so is consistent with their best interests.

To be sure, J testified that he was willing to foster a relationship between father and the children, and the juvenile court found that testimony credible. We agree that J's express willingness to maintain contact between the children and father mitigates, to a certain extent, the harm to the children posed by severing their legal relationship with their father. However, where a parent contends that a child's best interest can be met without termination, as is the case here, "the availability of another permanency plan that will advance the child's best interest, such as a permanent guardianship, may be a factor" in our decision. *T. M. D.*, 365 Or at 162-63. On that point, we observe that J's main goal was to provide the children with a permanent and stable home, and his testimony indicates that he would have been willing to serve as a guardian, if the juvenile court had ordered it.

For its part, the state does not dispute that the children are bonded with father, but it contends that, notwithstanding that bond, termination is in the children's best interests because of the risk that father would attempt to disrupt a permanent guardianship by encouraging the children to move to terminate it. The evidence offered in support of that argument is that father has shown up unannounced at J's home on multiple occasions to ask to take the children to the park and that father continued to have contact with mother despite the no-contact order. The state further emphasizes that, based on father's testimony regarding the June 2022 incident involving mother, which directly conflicted with statements he made to police, the juvenile court found that father's testimony lacked credibility. Accordingly, in the state's view, "there is no reason to believe that father would not attempt to disrupt a permanent guardianship."

We conclude that the evidence developed by ODHS in support of its case that termination is in C's and R's best interests does not clearly and convincingly persuade us that the benefits of permanently severing the children's legal relationship with father outweigh the risks posed by termination. We agree that the evidence establishes that it is in C's and R's best interests to remain long-term with their current caregivers, whom they see as their primary source of "comfort" and "protection." However, we are not persuaded that father's conduct in showing up at the home of his long-time friend hoping to take the children to the park evidences a likelihood that he would seek to disrupt a permanent guardianship. Indeed, Rouhier testified that, in response to father's behavior, J was "appropriate in setting" "boundaries" with father, and the record does not contain any evidence that father was uncooperative or otherwise belligerent when confronted with that boundary.

More to the point, we are unpersuaded that father's efforts to foster an interpersonal relationship with his children through a developmentally appropriate activity indicates an intent to legally challenge a guardianship. "[A] permanent guardianship is not a temporary arrangement"—the juvenile court may impose a permanent guardianship "only if the juvenile court finds that the grounds for termination of parental rights are met and finds that it is in the child's best interest that the parent never have physical custody." *Dept. of Human Services v. M. H.*, 306 Or App 150, 164, 473 P3d 1152 (2020) (citing ORS 419B.365(2), (3)). Additionally, a parent may not file a motion to vacate a permanent guardianship, ORS 419B.368(7), and a permanent guardian has the authority to set boundaries concerning the "physical custody and control" of the child. ORS 419B.367(6) (explaining that "a person appointed guardian has legal custody of the ward and the duties and authority of legal custodian and guardian under ORS 419B.373"); ORS 419B.373(1) (establishing the duties and authority of a legal custodian).

In other words, as a permanent guardian to C and R, J would have the authority, consistent with the terms of the guardianship order, to determine when and how the

children spend time with their father. We recognize that, under a permanent guardianship, father could seek visitation. ORS 419B.368(1) ("The court, on its own motion or upon the motion of a party *** may review [or] modify *** a guardianship order."); ORS 419B.367(3)(a) (providing that, in the order appointing the guardian, the court may "[s]pecify the frequency and nature of visitation or contact between relatives *** and the ward, if the court determines that visitation or contact is in the ward's best interests"). But seeking visitation through appropriate legal avenues is not inherently disruptive to a permanent guardianship, nor is it damaging to the children's sense of permanency in the same way that pressuring a child to vacate a guardianship would be.

Finally, we conclude that mother's failure to comply with the no-contact order does not carry ODHS's burden as to father. We have previously considered a parent's inability to comply with court orders in assessing whether termination is in a child's best interest. *Dept. of Human Services v. W. L. J.-E.*, 324 Or App 121, 124-25, 524 P3d 989 (2023). In *W. L. J.-E.*, based on the father's history of disregarding judicial orders, including violating an order prohibiting contact with his older children who had been removed from his care and regularly violating conditions of his probation, we concluded that "[t]here [were] reasons to fear that confusion and disruption would occur[,] *** even though [the] father could not undo the guardianship itself." *Id.* at 125. However, in this case, the no-contact order was a condition of *mother's* probation to which father himself was not subject. And although we share the juvenile court's concerns about their ongoing relationship and do not condone father's participation in mother's violation of her probation, under the circumstances presented here, we do not find that any boundary issues between father and mother clearly indicate that father would fail to respect boundaries imposed by J pursuant to a permanent guardianship or would otherwise pressure the children to discontinue the guardianship arrangement.

To that point, we defer to the juvenile court's finding that father did not testify credibly about the June 2022

incident with mother. However, that a victim of domestic violence recants a previous allegation against an abuser does not provide evidentiary support for the proposition that adoption is in the child's best interest because that parent would be unable to respect boundaries set by the prospective adoptive parent. And we fail to see a logical throughline connecting father's conflicting accounts of abuse to a likelihood that he would pressure the children to move to vacate the guardianship.

The state suggests that father's "honesty problems" permit a conclusion that he would attempt to disrupt a guardianship because there is no evidence to the contrary. But ODHS has the burden to present affirmative evidence of the harm and benefits to the child in severing the legal relationship with the parent. *L. M. B.*, 321 Or App at 52-53 ("The juvenile code demands a persuasive factual showing that termination of parental rights to a particular child is in that child's best interest, in view of the particular needs and circumstances of the child." (Internal quotation marks and brackets omitted.)); *see also Dept. of Human Services v. K. R. K.*, 348 Or App 651, 667, __ P3d __ (2026) ("The decision to sever a legal relationship is not one to be taken lightly, and, as we have made clear, ODHS bears the burden to demonstrate that it is highly probable that taking that irrevocable step is in the child's best interests."). The absence of evidence does not carry that burden. On this record, we cannot conclude that it is highly probable that termination is in C's and R's best interests.

Reversed.